Keith GRAYSON, Plaintiff-Appellant,

v.

AMERICAN AIRLINES, INC., a Delaware corporation, Defendant-Appellee.

No. 85–1105.

United States Court of Appeals, Tenth Circuit.

Oct. 22, 1986.

Rehearing Denied Nov. 13, 1986.

Kathy Evans Borchardt, Tulsa, Okl., for plaintiff-appellant.

· David P. Page (Frederic N. Schneider, III, with him on the brief), Tulsa, Okl., for defendant-appellee.

Before BARRETT and TACHA, Circuit Judges, and BROWN,* District Judge.

BARRETT, Circuit Judge.

Keith Grayson appeals from the district court's grant of American Airlines' (American) motion for summary judgment on Grayson's claims of breach of employment contract and promissory fraud and the denial of Grayson's motion for new trial or in the alternative, motion to reconsider.

---

* The Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

Grayson began his employment with American in May, 1966. At that time he signed a terms of employment application which contained a provision stating that Grayson was an employee at will. Thus, either American or Grayson had the right to end the relationship at any time for any reason or for no reason. The application also provided that his employment would be in accord with the company's rules and regulations and any amendments thereto. In a copy of the employee handbook, later distributed to Grayson, one of American's rules stated that "no one would be disciplined or discharged without good cause."

Grayson was based in Tulsa, Oklahoma, as a member of American's engineering department. In April, 1981, he was approached about a temporary transfer to Toronto, Canada, to assist with an expected influx of summer travelers. Grayson inquired whether his job in Tulsa would be open when his assignment in Toronto ended and was told that he would have a job waiting for him when he returned. Grayson accepted the work assignment in Toronto for several months. He returned to Oklahoma in September, 1981. Soon after his return American notified Grayson that his position in Tulsa was to be eliminated as part of a company-wide reduction in force due to adverse economic conditions from deregulation and the air traffic controller's strike.

After being notified of his impending termination, Grayson informed American that he was desirous of continued employment. He applied for other jobs within the company, letting it be known that he would accept a position at a lower pay grade. "[I]t was determined that American did not have any position available for which Grayson, in American's judgment, was best qualified." (R., Vol. I, p. 44.) He was terminated on January 4, 1982, and received 32 weeks of severance pay.

Grayson filed this action claiming breach of employment contract and promissory fraud. The trial court granted American's motion for summary judgment on both counts. On appeal Grayson raises the fol-lowing questions: 1) whether the trial court erred in finding that Oklahoma does not recognize a cause of action for breach of an employment contract when the contract is terminable at will and for an indefinite term; 2) did the evidence presented show, as a matter of law, that Grayson was terminated for "good cause"; and 3) did the evidence presented show, as a matter of law, that Grayson could not establish a claim for "promissory fraud."

## I.

Grayson contends that the trial court erred in finding that Oklahoma does not recognize a cause of action for breach of an "at will" employment contract. On the basis of the trial court's second order, issued in response to Grayson's motion to reconsider, we believe that although the trial court initially found no cause of action, the court changed its finding with respect to this issue.

The parties disagreed regarding how Grayson's employment contract should be characterized. American argued that it was an at will employment contract. Grayson argued that American's right to terminate had been limited by subsequent events.

Grayson's employment application indicated that American could terminate him at any time. However, the application also stated that employment would be in accordance with the provisions of the application, company rules and regulations, and amendments thereto though American reserved the right to amend, modify, or revoke the rules at any time. The application required Grayson to familiarize himself with the rules and to abide by them. At some undisclosed time after he was employed, Grayson was given a personnel handbook which stated "No one is discharged or disciplined unreasonably." This rule was later amended to read "No one will be disciplined or discharged without good cause." Grayson claims that after the issuance of this rule, American's power to terminate was limited, i.e., to terminate based on "good cause."

Grayson presented evidence, in addition to the employee handbook to show that the "at will" provision in the original employment agreement had been modified. This evidence consisted of a note Grayson gave to his supervisors indicating that he intended to take early retirement at age 55 in 1984. This, Grayson claimed, made him a permanent employee. The note, however, was found by the trial court to have been submitted merely as a response to a 1979 poll conducted by American concerning future plans of all employees. Grayson does not appeal the finding concerning the note.

In its order granting American's summary judgment motion, the trial court found that Grayson was terminable at will and that Oklahoma did not recognize a cause of action for breach of contract in such a situation. Grayson then filed a motion for a new trial and, in the alternative, a motion to reconsider. In response to these motions the trial court issued an order which provided, "The [c]ourt, upon reflection, concludes the existence of an employee manual with a provision that employees would be terminated only for 'good cause' may well have established an employment contract between the parties under *Langdon v. Saga*, 569 P.2d 524 (Okl.Ct.App.1977).... Thus, the employment manual herein may have created a contractual obligation on the part of defendant American Airlines to terminate plaintiff only for 'good cause.'" (R., Vol. I, pp. 232–33.)

By virtue of the aforesaid order, the trial court found that Grayson was no longer an at will employee and that American could discharge him only for good cause. Such a finding, however, does not aid Grayson because the trial court was nevertheless convinced that "no material issue of fact [existed] concerning the question of good cause." (R., Vol. I, p. 233.) The good cause established here was an economic downturn in the airline industry caused by the air traffic controllers strike and deregulation. Grayson conceded that such conditions existed in the economy and that they constituted good cause. *See also, Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391 (9th Cir.1985).

If good cause to terminate existed, as it did in this case, that finding does not eliminate an inquiry into Grayson's allegations that American breached its implied covenant of good faith dealing. The trial court did not discuss this matter. Relying on *Hall v. Farmers Insurance Exchange*, 713 P.2d 1027 (Okla.1986), American insists that the covenant of good faith dealing is operable only if the employee has been denied some earned benefits to be paid in the future. American claims Grayson was not denied any such benefits.

We disagree with American's narrow reading of *Hall*. In *Hall*, the Oklahoma Supreme Court held that a covenant of good faith is implicit in every contract, even in at will employment contracts. "In this spirit, we have recognized, as have many jurisdictions, that each contract carries an implicit and mutual covenant by the parties to act toward each other in good faith." *Hall, supra* at 1253. "The implied covenant of good faith extends to a covenant not to wrongfully resort to the termination-at-will clause." *Id.* Although *Hall* did involve a factual scenario in which the plaintiff sought payment of future commissions from renewal premiums on insurance policies he sold, the language of the *Hall* court quoted above, "[W]e have recognized ... that each contract carries an implicit and mutual covenant by the parties to act toward each other in good faith," *id.*, lends no indication that the court intended such a narrow application of the good faith requirement. The plain language and the *Hall* court's holding indicate the opposite—that good faith is mandated in all contracts. We view this as a clear indication that the Oklahoma courts have recognized an implied covenant of good faith in contractual dealings.

Grayson alleged in his complaint that American breached this implied duty of good faith by the following actions: After Grayson received notice of his termination he applied for other positions within the company; he was willing to accept lower paying positions; his supervisors assured

him that they would assist him in finding another job; Grayson was turned down for all other positions for which he applied; he responded by submitting documentation to the company showing that he was, in fact, qualified for these open positions; and at a meeting with Grayson and several managers, American countered by revoking Grayson's access badge which had allowed him entry onto company property including the facility where notices of vacancies were posted and where part of the Personnel Department was located. He also alleges that American continued to hire after it terminated him.

The trial court, while not expressly considering the bad faith issue, discussed some of these factual allegations in its order following the motion to reconsider. "He also alleged in his deposition testimony that he was qualified for other positions within American Airlines and was not given any of those positions. Again, no evidence is offered to support his contention that he was qualified to fill the positions." (R., Vol. I, pp. 233–34.)

In response to American's motion for summary judgment, Grayson submitted the following portions of his deposition to the trial court:

A Actually there was the bulletin for the position ... attached to this, if you notice, the staple hole and the black dots where the staple holes were, it was underlined that I did not have three years of computer programming experience. Hence is why I wrote in my Exhibit 14, which is now Exhibit F, I had developed over the past four years, so I had more computer programming experience than the job [that was applied for] required. In addition, American Airlines had actually sold computer programs that I had developed to General Electric.

Q I see. So you did some computer programming along with your engineering duties?

A Correct.

Q Are there "computer programmer" positions at American Airlines?

A Yes. But not in Engineering.

Q Okay. And what do they do, if you know?

A They program or they write different programs for American Airlines management requirements.

Q And they do it all on a full time basis?

A Correct.

Q This four-year period that you were referring to in Exhibit F, was that four years of full time computer programming experience?

A No, this was four years of programming experience for different programs that we used in the Engineering Department and my work.

Q In conjunction with your engineering duties?

A Yes. And I might add, of a more complex nature than the ones that were probably being written by the computer people in their normal day-to-day activity.

(R., Vol. I, pp. 220–21.)

\* \* \* \* \* \*

A [M]y letter of December the 2nd, which is Exhibit 11 of the interrogatory, wherein that I say that there are presently grade 55 positions open in the J.F.K., that's Kennedy, New York Line Maintenance, and that other management specialist positions are soon to be available in the Tulsa Production Control organization which would be formed in '82, which I knew was coming.

Also, if you notice here, I advised that I'm willing to accept a lower grade position. American Airlines stated when it was laying me off that I would be considered for other positions within the company. Just as part of the words, in fact, it is in the layoff notice that you mentioned earlier. "Although our system-wide cost reduc-

tion effort made it unlikely that an alternative position would be available for you, the Director of Selection has been notified you are to be surplus and we'll refer you for any available positions for which you qualify."

There were positions bulletins on the bulletin board in Tulsa, grade 55, for which I qualified, more than qualified (Grayson was a grade 78), which I was not given an opportunity to be considered for. I also bid on a programmer analyst position in the Computer Center, of which I met all the requirements. I was given a false reason for rejection, to which I again responded, demonstrating that their reasons for rejection [were] false. The outcome of these applications was that I was then taken into a meeting for the Vice President of Engineering, my badge was removed from me, with no valid reason given in writing. In fact, no valid reason given, purely conjecture or hearsay by the individuals, which was to prevent me from entering the premises of American Airlines, even though I still was an employee of American, where I could find or become aware of positions that were open by a bulletin or about to be bulletined.

So they prevented me from becoming aware of any positions. In other words, they denied me the opportunity to in fact seek alternative employment within the airline.

(R., Vol. I, pp. 116–17.)

"In reviewing the district court's grant of summary judgment, we must view the case in the same manner as did that court. Thus, we must determine whether any genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. In doing so, we must view the record in the light most favorable to the party opposing the motion." *R–G Denver v. First City Holdings of Colorado, Inc.,* 789 F.2d 1469, 1471 (10th Cir.1986) (citations omitted). *See also, Celotex v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

▇ In applying these standards, we believe that Grayson has identified enough specific information to present a material question of fact as to whether or not American breached the implied covenant of good faith by its actions. Grayson presented evidence of vacant positions in New York and Tulsa which he apparently qualified for by his skills and grade level. He also described how he was qualified to fill certain computer analyst openings for which he had applied and been rejected. He told of American's removal of his access badge so he could no longer see posted job notices. In the affidavits submitted by American there is no attempt to refute most of Grayson's allegations. In reviewing this record in a light most favorable to Grayson, as we must, *R–G Denver, supra,* we believe that he has presented adequate evidence to clear the summary judgment hurdle by demonstrating that material issues of fact exist as to whether American breached its good faith obligation.

**II.**

▇ As his second cause of action, Grayson alleged promissory fraud by American. It is undisputed that American promised him that he could return to a job in Tulsa once the position in Toronto had concluded. Grayson asserts, however, that American never intended to perform this promise because it had already made the decision to eliminate Grayson's position in Tulsa when the Toronto offer was made. Grayson argues that the job assignment in Toronto was optional. American argues that it was mandatory. Grayson concedes that if the transfer was mandatory he cannot establish that he relied on American's representations to his detriment. Detrimental reliance is an essential element of promissory fraud.

The trial court agreed with American's position that the assignment was mandatory and found American's authority to be two-fold in ordering Grayson's transfer.

First, American's personnel regulation 120–1(P) provides: "A regular employee may be placed in a temporary assignment due to operating needs of the Company or when the employee requests the assignment." (R., Vol. 1, p. 203.) This became, in effect, a condition of employment because Grayson agreed to abide by the company's rules and regulations when he accepted employment with American. The regulation allows American to exercise its business judgment and adjust personnel assignments in accordance with fluctuating needs. This is a prerogative of the company. American could have made the Toronto assignment mandatory, although it did not need to do so because Grayson readily accepted the transfer.

Second, the trial court found that under agency law, "Unless otherwise agreed, an agent is subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he has contracted to perform. *Restatement of Agency 2d*, § 385." (R., Vol. 1, p. 203.) The court found that Grayson had a duty as an employee of American to accept the assignment.

From this duty and the company regulation, the trial court concluded that Grayson's Toronto assignment was mandatory and not optional. Grayson was under a duty to go and he could not claim that he was fraudulently induced into doing that which he was required to do. We agree with the trial court that no material question of fact existed on the issue. Therefore, Grayson could not prove detrimental reliance and he failed to establish an essential element of promissory fraud. An inability to establish a required element of one's cause of action necessitates a dismissal by the court. *D & H Co., Inc. v. Shultz*, 579 P.2d 821, 824 (Okla.1978). The trial court properly found that his claim of promissory fraud must fail.

REVERSED in part, AFFIRMED in part and REMANDED for further proceedings consistent herewith.