David MORTON, Plaintiff–Appellant,

v.

The HEARST CORPORATION, et al.,
Defendants–Respondents.

No. WD 40889.

Missouri Court of Appeals,
Western District.

Aug. 15, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 31, 1989.

Dennis E. Egan, Bert S. Braud (argued), Kansas City, for plaintiff-appellant.

Donald W. Giffin (argued) and Mark P. Johnson, for defendant Hearst Corp.

Bernard J. Rhodes, for defendant Kansas City Business Journal.

Before NUGENT, C.J., CLARK and LOWENSTEIN, JJ.

NUGENT, Chief Judge.

Plaintiff David Morton appeals from the trial court's judgments dismissing his claim for libel and directing a verdict for the various defendants. He argues on appeal that the court improperly dismissed his libel claim against defendants *The Kansas City Business Journal* (Business Journal) and Michael Russell; that it improperly directed a verdict in favor of the defendants Hearst Corporation and Michael Sullivan on his claim for tortious interference with his employment contract; and that the court improperly directed a verdict in favor of the Business Journal and Mr. Russell against the plaintiff's claim for breach of the implied covenant of good faith in his employment contract. We Affirm.

In determining whether the plaintiff made a submissible case, we will view the evidence in the light most favorable to his claims, giving him the benefit of all of the inferences that we may reasonably draw from that evidence. *Minnesota Mining and Manufacturing Co. v. Williamson,* 675 S.W.2d 951, 953 (Mo.App.1984). We may not, however, infer a fact essential to the claim's submissibility unless a substantial evidentiary basis supports that inference. *Id.* Some of the evidence that came into this case could properly be admitted against only one group of the defendants.[1] Accordingly, in determining the sufficiency of the evidence to support the claim against each defendant, we will consider only that evidence properly admissible against that party.

This lawsuit arises from events during and shortly after Mr. Morton's tenure as a radio and television reporter for the Business Journal. His position with the Business Journal arose out of arrangements the Business Journal had made with KMBC–TV (Channel 9) and KCMO radio. Defendant Russell serves as the president of the Business Journal and defendant Hearst Corporation owns KMBC. Defendant Sullivan served as KMBC's news director at the time most of the events leading to this

---

1. For example, evidence admissible against the Business Journal as that party's admissions amounted to inadmissible hearsay against the Hearst Corporation.

lawsuit occurred. KCMO is not a party to this lawsuit.

Under those arrangements, the Business Journal agreed to supply the broadcast companies with a reporter for business news and to pay the reporter's salary for his appearances on each station. In return, KCMO radio supplied the Journal with air time and commercial spots. The television station did not compensate the Business Journal for its services, but the Journal stood to benefit from the exposure it received: its logo appeared behind Mr. Morton during his television reports.

Before representatives of the Business Journal contacted Mr. Morton, he worked as a news announcer for KMBZ radio station and taught school for the Kansas City school district. He agreed to leave those jobs to take the position as a radio and television reporter for the Business Journal. His initial one-year contract called for a $52,000 salary, plus wardrobe and car expense allowances. He had questioned the thirty-day termination clause in the Business Journal's original offer, and the Journal agreed to termination only upon sixty days notice.

Following his first year of service, the Business Journal offered to renew Mr. Morton's contract with a raise in pay. He told them that he would prefer to extend the contract for two years instead of one and that he was willing to work for a smaller salary in return for the greater security. The parties agreed to a two-year contract at a salary of $56,200 plus expense allowances and a clause providing for termination by either party upon sixty days notice.

Mr. Morton's reports drew a favorable response. He received complimentary letters from listeners and praise from his associates and his employer. The primary negative aspect of his job performance involves a dispute he had with defendant Sullivan, KMBC's news director. On that occasion scheduling difficulties prevented his completion of a report in time for the news broadcast. Mr. Morton objected when Mr. Sullivan, rather than allowing him to present a partial report, directed

him to write the story for the KMBC anchorman to deliver. Mr. Morton explained that he sought to protect the Business Journal's interest in receiving credit for the story. The plaintiff's objections and his later complaint to Mr. Russell, president of the Journal, about the incident irritated Mr. Sullivan. They did not speak from that day until after the plaintiff's dismissal twelve days later.

Mr. Morton's dismissal followed a meeting between Mr. Russell and Paul Dinovitz, the newly appointed general manager of KMBC. Mr. Dinovitz had determined that large numbers of individually reported segments detracted from the newscasts. He also thought that devoting air time to a competing news organization (the Business Journal) did not serve the station's best interests. Before his meeting with Mr. Russell, Mr. Dinovitz had already removed several other segments from the newscast. At that time only the Business Journal report and Walt Bodine's segment remained.

Following the meeting, Mr. Russell told the plaintiff that he would pay his salary for the next sixty days but that he no longer required the plaintiff's services. Mr. Morton asked for and received his severance pay in a lump sum. Mr. Russell agreed to allow Mr. Morton to seek a similar arrangement with other television and radio stations, but informed him that he would pay no more than $12,000 for such an arrangement. He also agreed to allow Mr. Morton to "maintain his visibility" in the broadcast community by continuing to deliver reports on KCMO radio. Channel 9 circulated a memo explaining that Mr. Morton would no longer deliver the Business Journal reports but that the station would maintain a relationship with the Business Journal.

Two articles appeared in *The Kansas City Star* describing the end of Mr. Morton's relationship with the Business Journal and Channel 9. Those articles attributed a statement to Mr. Russell that he had fired Mr. Morton at KMBC's behest. It also quoted Mr. Russell as saying that the plaintiff had been unable to arrange a sim-

ilar deal with other television stations because "they didn't want Morton's style of reporting."

Mr. Morton then filed his petition, naming the Business Journal, the Hearst Corporation, Mr. Russell, and Mr. Sullivan as defendants, and seeking damages for tortious interference with contractual relations (Count I), libel (Count II), civil conspiracy (Count III), and breach of his employment contract (Count IV). The court dismissed Court II, the libel claim, finding that the plaintiff had failed to state a cause of action for either libel per se or libel per quod. Mr. Morton amended his petition, asserting that defendant Russell's statements had caused him to lose opportunities for similar employment. The court dismissed the amended Count II, finding that it had similarly failed to state a claim. The remaining counts went to trial, and at the close of the plaintiff's evidence the court directed a verdict in favor of the defendants on all of the counts.

Mr. Morton now appeals from portions of the trial court's judgment. He argues on appeal that the trial court improperly dismissed his libel claim against defendants Russell and the Business Journal. He appeals the court's directed verdict against his claim for tortious interference only as to the defendants Hearst Corporation and Sullivan. He also appeals from the directed verdict in favor of the defendants Business Journal and Russell on his claim for breach of the implied covenant of good faith in his employment contract. The plaintiff has apparently abandoned his claim for civil conspiracy. He did not mention it in any of his points on appeal and did not mention it when he summarized his remaining claims in his reply brief. *See* Rule 84.04.

■ Mr. Morton argues in his first point that the court improperly dismissed his li-

bel petition. He contends that his initial petition pleaded a cause of action in libel per se in that the defendants' statements imputed a want of skill in his profession. He also asserts that his amended petition properly pleads libel per quod by alleging extrinsic facts that show the false and damaging nature of the defendants' statements and a specific instance in which he suffered monetary damage as a result of those statements.[2]

■ We note initially that the plaintiff's notice of appeal demonstrates an intent to appeal only from the court's order dismissing his original libel claim. In that he has failed to present any error arising from the court's dismissal of Count II of his amended petition. Accordingly, we will not consider that portion of his argument that challenges the court's dismissal of his claim for libel per quod. *See Green Hills Production Credit Association v. R & M Porter Farms, Inc.,* 716 S.W.2d 296, 300 (Mo. App.1986).

■ Plaintiff's claim that the defendants' statements libeled him per se rests on the assertion that those statements injured him in his profession. To libel him per se the statements must impute a want of knowledge, skill, capacity, or fitness to perform or discharge his duties. *Brown v. Kitterman,* 443 S.W.2d 146, 154 (Mo.1969). The words must be defamatory in the legal sense. "To defame is to speak evil of one maliciously, to dishonor, to render infamous." *Id.* at 149, quoting *Diener v. Star-Chronicle Publishing Co.,* 232 Mo. 416, 135 S.W. 6, 11 (1911). The initial determination of whether the statement is capable of a defamatory meaning rests with the court as a question of law. *Id.* at 150; *Henry v. Halliburton,* 690 S.W.2d 775, 779 (Mo.1985) (en banc). Finally, in determining whether the statements are defamatory, the court must consider them,

**2.** An action for libel per se arises when the published words are defamatory on their face. To support a cause of action for libel per se the plaintiff need only plead that the defendant published the defamatory words about the plaintiff. *Dietrich v. Pulitzer Publishing Co.,* 422 S.W.2d 330, 333 (Mo.1968). The law will presume that the plaintiff suffered damages from such a publication. *Brown v. Kitterman,* 443 S.W.2d 146,

149 (Mo.1969). If the defamatory nature of the publication does not appear from the words themselves, to establish a cause of action for libel per quod the plaintiff must plead extrinsic facts explaining how the statement tends to defame him. In addition, he must plead facts showing that he suffered actual harm from the alleged defamation. *Id.*

not in isolation, but in the context of the entire publication. *Buller v. Pulitzer Publishing Co.*, 684 S.W.2d 473, 477 (Mo.App. 1984).

■ Mr. Morton finds defamatory the defendants' statements that he failed to increase the public's awareness of the business journal, that Channel 9 insisted on his removal, and that other stations did not want his style of reporting. Following *Buller, supra,* we must read those statements in the context of the entire article in which they appear. There the defendants discuss their broadcasting relationship with Mr. Morton and with Channel 9 as an experiment. The statement about Channel 9's involvement in removing Mr. Morton relates to a discussion of the station management's decision to present business news in a different manner. A statement that one has lost his job as a result of a television station's decision to change its format does not amount to defamation.

■ The reference to other stations' lack of desire for Mr. Morton's style of reporting relates to the earlier reference to his "stiff" presentation. Although such a characterization certainly does not enhance the career of a broadcaster, it amounts to an opinion. As such, the statement falls within the privilege accorded to statements of opinion and, therefore, does not support a cause of action for defamation. *Henry v. Halliburton, supra,* 690 S.W.2d at 782. The trial court properly dismissed the plaintiff's claim for defamation.

■ Plaintiff's second point alleges that the court erred in directing a verdict against his claim for tortious interference with his employment contract. That cause of action has five elements: a contract or business expectancy; the defendant's knowledge of the relationship; intentional interference by the defendant that causes a breach of the contract or ends the business relationship; absence of justification; and damages. *C & M Developers, Inc. v. Berbiglia, Inc.,* 585 S.W.2d 176, 183 (Mo.App. 1979). The plaintiff has the burden of proving each element by substantial evidence. *Tri–Continental Leasing Co. v. Niedhardt,* 540 S.W.2d 210, 211 (Mo.App. 1976).

■ The plaintiff's cause of action against defendant Sullivan must fail because the evidence does not establish that Mr. Sullivan interfered with Mr. Morton's relationship with the Business Journal. The plaintiff's attempt to link Mr. Sullivan to the termination consisted of evidence that he and Mr. Sullivan had an argument, that Mr. Russell and Mr. Sullivan had occasionally socialized, that Mr. Sullivan had written poems for Mr. Russell, and that Mr. Sullivan had assisted Mr. Russell in an attempt to arrange broadcast opportunities in other markets. From those facts, the plaintiff urges us to infer that the defendant "called in a favor" from Mr. Russell to avenge the ill feelings that arose from Mr. Sullivan's argument with Mr. Morton, and that the favor consisted of firing Mr. Morton.

The plaintiff, however, presented no evidence of any communication between Mr. Sullivan and Mr. Russell between the date of the argument and the date of his termination. Any conclusion that the parties communicated and that if they did communicate that the communication led to Mr. Morton's demise amounts to mere speculation. Such speculation does not amount to substantial evidence sufficient to support the plaintiff's cause of action. The court properly directed a verdict in defendant Sullivan's favor.

For those reasons, the plaintiff may not base his cause of action against the defendant Hearst Corporation on Mr. Sullivan's actions. Nevertheless, the plaintiff did introduce evidence that would tend to establish that a representative of the defendant corporation participated in the decision to remove him. His termination followed a meeting between his employer and Mr. Dinovitz, KMBC's station manager. Shortly thereafter the station circulated a memo explaining that Mr. Morton would no longer appear on Channel 9. That coincidence supports the inference that a decision at that meeting led Mr. Russell to fire the plaintiff.

■ Plaintiff Morton's claim against the Hearst Corporation must also fail because in this instance he did not prove that the defendant's actions lacked justification.

Absence of justification remains an essential element of a cause of action for tortious interference with a business relationship. *Hill v. Kansas City Star Company,* 719 S.W.2d 808, 811 (Mo.App.1986). One acts without justification when he maliciously interferes with another's contract or business relations. *Gerstner Electric, Inc. v. American Insurance Co.,* 520 F.2d 790, 794 (8th Cir.1975); *C & M Developers, supra,* 585 S.W.2d at 184.

The plaintiff's theory of malice revolved around the purported ill will that existed between himself and Mr. Sullivan. We already rejected that theory. Other evidence that the plaintiff presented tended to establish not malice but justification for the defendant's action. The plaintiff presented Mr. Dinovitz's deposition in which the station manager explained that he considered it a bad practice to provide a competing news organization with the type of exposure that the Business Journal received. That provided a valid business reason to remove Mr. Morton from his on-air position, and evidence of it supports our conclusion. We conclude that the trial court properly directed a verdict against the plaintiff's claim.

Finally, Mr. Morton contends that the court improperly directed a verdict against his claim for breach of the covenant of good faith that the law implies in his employment contract. The defendants Business Journal and Russell counter that no such covenant exists in an employment contract, or at least not in an employment contract that contains a termination clause. To support their position, the defendants rely on Missouri cases in which the courts have refused to recognize exceptions to the employment-at-will doctrine. *See e.g. Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661 (Mo.1988) (en banc); *Hanrahan v. Nashua Corp.,* 752 S.W.2d 878, 883 (Mo.App.1988); *Neighbors v. Kirksville College of Osteopathic Medicine,* 694 S.W.2d 822, 824 (Mo.App.1985).

The defendants admit, however, the Mr. Morton's contract called for a specific term of two years. The cases cited above limit their application to those situations in which no constitutional, statutory, or contractual term provides otherwise. *Johnson*

at 662, *Hanrahan* at 884; *Neighbors* at 823. The defendants do not contend that the sixty-day termination clause transformed the parties' contract into an at-will employment relationship. The Business Journal could terminate Mr. Morton's employment only in compliance with the contract, not at its pleasure.

Missouri law implies a covenant of good faith and fair dealing in every contract. *Martin v. Prier Brass Manufacturing Co.,* 710 S.W.2d 466, 473 (Mo.App. 1986). In *Martin* we held that a party committed a breach of that covenant by resorting to a contract clause that provided for unilateral action and by doing so deprived the other party of its expected benefits under the contract. *Id.* Similarly, the Oklahoma Supreme Court, in *Hall v. Farmers Insurance Exchange,* 713 P.2d 1027, 1030 (Okla.1985), held that bad faith resort to a termination clause in an insurance agency contract subjected the party who committed the breach to liability for damages that the termination caused.

In *Hall,* the defendant insurance company had resorted to the termination clause in response to the plaintiff's vocal objections to company policies. The court found as further evidence of bad faith that the defendant's action served to deprive the plaintiff of renewal his expected income from renewal premiums and "to parcel that income among its other, less obstreperous agents," those less vocal in their opposition to company policies. *Id.* Those premiums generated a substantial portion of the agent's normal compensation. Accordingly, the court found Hall entitled to the benefits that he would have received but for Farmers' bad faith termination. *Id.* at 1031.

We see no reason to depart from the principle of law that implies a covenant of good faith in every Missouri contract. Nevertheless, in this case the court properly directed a verdict against Mr. Morton's claim. He failed to produce substantial evidence to prove bad faith on the part of defendants Russell and the Business Journal. As we noted above, no substantial evidence supports the inference that Mr. Russell terminated Mr. Morton's contract as a favor to Mr. Sullivan.

Moreover, the mere fact that Mr. Morton failed to receive the benefits that he would have received had his contract run the full term does not mean that the defendant Journal's resort to the termination clause amounted to bad faith. In *Hall*, although the renewal premiums amounted to a substantial portion of the plaintiff's regular income, the commissions compensated him for policies he had already sold. Farmers also continued to receive the benefit of the payments for those policies. In contrast, the Business Journal in this case paid Mr. Morton for all of the services he rendered. Because the Journal report would no longer appear on Channel 9, the Journal would no longer obtain any benefit from Mr. Morton's continued service. Under the circumstances of this case, the defendants exhibited no bad faith by resorting to the termination clause of the employment contract.

Accordingly, we affirm the trial court's judgments dismissing Mr. Morton's claim for libel and directing a verdict on behalf of the defendants.

All concur.