Jody MARSHALL, Appellant,

v.

OK RENTAL & LEASING, INC., dba Dollar Rent A Car, a corporation, Appellee.

No. 82232.

Supreme Court of Oklahoma.

March 18, 1997.

Rehearing Denied June 26, 1997.

See also: 879 P.2d 132.

Thomas L. Bright, Tulsa, For Appellant.

Donald M. Bingham, Stephanie L. Theban, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, For Appellee.

SIMMS, Justice:

Jody Marshall appeals the summary judgment entered in favor of her former employer, OK Rental & Leasing, Inc. d/b/a Dollar Rent a Car (Dollar), on her claims of constructive discharge due to sexual harassment by a co-employee and intentional infliction of emotional distress. The trial court found that the undisputed facts did not support Marshall's claims, and the Court of Civil Appeals affirmed on appeal.

Certiorari was granted to consider the first impression question of whether the public policy exception to the employment-at-will doctrine enunciated in *Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla.1989), applies to an employee claiming sexual harassment at work caused her to be "constructively discharged", i.e. she was not terminated but quit due to an intolerable work environment intentionally created by the employer.

Because we find the public policy exception of *Burk* does not apply in Marshall's case, we vacate the Court of Civil Appeals opinion and affirm the judgment of the district court. The judgment for defendant on the cause of action for intentional infliction of emotional distress is also affirmed. The facts adduced from affidavits, Marshall's diary and other summary judgment attachments follow.

I

Dollar hired Marshall to work at its airport location in Tulsa renting cars to travelers. A co-worker, Frazier, occasionally asked her to go on dates with him. She refused and "mentioned" it to her supervisor in hopes that the supervisor would say something to Frazier about it, but apparently the supervisor said nothing to Frazier. One night when Marshall came home, Frazier was waiting for her. After talking for about thirty minutes, Frazier moved towards her as if to kiss her. She laughed and told him that she just wanted to be his friend. The next day she asked the supervisor about any company rules regarding employees dating. The supervisor told her there was no such rule.

Sometime later, Frazier approached her again and tried to kiss her. Marshall wrote in her diary that her complaints were getting nowhere but that she was not going to quit Dollar. After working for a couple of months, Marshall got a few days off to visit her mother in Wisconsin. She asked Frazier to switch other days with her so she could be gone longer. Frazier said that he would switch with her in exchange for sex. The supervisor overheard this and told Marshall that he would have a talk with Frazier. Frazier was reprimanded for his conduct and told not to do it again.

While away on vacation, she again called to get an extra day off, but Frazier told her that he was going to get her fired. She assumed he was mad because she got him in trouble with the supervisors. In a continued effort to get more time off, Marshall spoke to another supervisor. When he was reluctant to give her any more time off, she quit and never returned to work. Besides being reprimanded, the facts indicate that Frazier quit

his employment with Dollar two weeks after the last incident with Marshall.

Marshall brought this action claiming Dollar allowed on-the-job sexual harassment by a co-worker. She brings these claims under the umbrella of the public policy tort action of *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla. 1989).

## II

THE FACTS DO NOT SUPPORT A CLAIM FOR WRONGFUL DISCHARGE UNDER THE *BURK* PUBLIC POLICY EXCEPTION TO THE TERMINABLE AT–WILL DOCTRINE.

 Under *Burk, supra,* we carved out an exception to the long-standing rule that an employment contract of indefinite duration is terminable by either the employer or the employee at anytime. The terminable at-will doctrine acknowledges that an employer may discharge an employee for good cause, for no cause or for cause morally wrong, without bearing any legal responsibility. The exception recognizes that under certain circumstances the employer has committed a wrong against the employee and society at large when the employee is discharged for doing that which is right or refusing to do that which is wrong. We specifically held:

"... [w]e believe ... an actionable tort claim under Oklahoma law is [presented] where an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." 770 P.2d at 29.

In allowing a public policy exception tort claim, we emphasized that it only applies: "in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law.... In light of the vague meaning of the term public policy we believe the public policy exception must be tightly circumscribed." 770 P.2d at 28–9.

 Marshall contends that the anti-discrimination statutes of Oklahoma, 25 O.S. 1991, §§ 1101 *et seq.,* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1988 and Supp.1992), (Title VII), embody public policies upon which she can base a *Burk* wrongful discharge claim. We have never before addressed this exact question. In considering Marshall's wrongful discharge claims we must strictly construe the claimed public policy to see if a clear mandate of public policy exists. We find Marshall has not stated a wrongful discharge claim under *Burk* because she brings this claim based upon her status rather than her conduct. *List v. Anchor Paint Mfg. Co.,* 910 P.2d 1011 (Okla.1996) (discussed *infra* ).

Marshall asserts she was constructively discharged from her employment by the sexual harassment imposed upon her by Frazier, a co-worker. She points to *Wilson v. Hess–Sweitzer & Brant, Inc.,* 864 P.2d 1279 (Okla. 1993), for a definition of the term "constructive discharge". Although we did not actually define the term in *Wilson,* we found no error in the trial court giving a jury instruction which defined "constructive discharge" as occurring when "an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no choice but to quit." 864 P.2d at 1283. Marshall contends the sexual harassment she suffered while at Dollar made her work environment so intolerable that she had to quit to remove herself from the abuse.[1]

 Sexual harassment is a form of gender-based discrimination which can be shown under one of two primary theories: *quid pro quo* discrimination or hostile work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (discussing sexual harassment as a violation of Title VII). *Quid pro quo* sexual harassment occurs when the employee must submit to unwelcome sexual favors in order to gain some

---

1. *Wilson v. Sweitzer, supra,* was a retaliatory discharge case based upon a statute in the Workers' Compensation Act, with a cap on damages. 85 O.S.1991 §§ 5, 6. Due to our disposition here we need not address the question of whether a former employee can state a common law *Burk*-style claim based on constructive discharge.

economic or employment benefit. The employee must give "something for something" hence the Latin title *"quid pro quo."*

■ Hostile work environment sexual harassment occurs when conduct at the workplace " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " 477 U.S. at 65–66, 106 S.Ct. at 2404–05 (quoting 29 CFR § 1604.11(a)(3) [1985] ). *Accord Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (affirming and explaining *Meritor Sav. Bank* ). For hostile work environment sexual harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. at 2405.

■ Marshall claims she was exposed to both forms of sexual harassment at her workplace. Her claim for *quid pro quo* harassment is grounded upon her assertion that in order to get Frazier to switch work days with her she had to agree to have sex with him. We need not address the *quid pro quo* claim because the sexual harassment did not come from a supervisor or employee with supervisory authority. Rather, the *quid pro quo* claim was predicated on remarks made by a peer worker, an employee on the same level of responsibility and authority as Marshall. Marshall presents no evidentiary materials showing Frazier had any supervisory control over her or could affect whether she received some economic or employment benefit.

In *Highlander v. K.F.C. Nat'l Management Co.,* 805 F.2d 644, 648 (6th Cir.1986), the court noted that in *quid pro quo* actions the complaining party must show that "submission to the unwelcome sexual advances of *supervisory personnel* was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's failure to submit to the sexual demands of supervisory employees." (Emphasis added). *See also Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir.1990) (quid pro quo harassment occurs "when a

*supervisor* conditions the granting of an econic or other job benefit upon the receipt of sexual favors *from a subordinate,* or punishes that subordinate for refusing to comply") (Emphasis added); *McCallum v. Dept. Of Corrections,* 197 Mich.App. 589, 606, 496 N.W.2d 361, 369 (1993) (*"Supervisory officials* cannot be held liable for [*quid pro quo* ] *sexual harassment by subordinate employees* unless the supervisor either encouraged the misconduct or in some way directly participated in it.") (Emphasis added). There is nothing to indicate that the supervisors at Dollar encouraged or participated in Frazier's "something for something" demands. Rather, Frazier was reprimanded by the supervisor for making the remark. Therefore, we find the trial court correctly entered judgment for Dollar on the *quid pro quo* claim.

■ Marshall's hostile work environment claim is based upon allegations that her supervisors at Dollar knew about the unwelcome advances Frazier made towards her and failed to do anything about it. She asserts Dollar allowed Frazier to create a work environment that was so intolerable and offensive that she was forced to quit in order to remove herself from it. We find this matter is governed by *List v. Anchor Paint Mfg. Co.,* 910 P.2d 1011 (Okla.1996), where we found that Oklahoma does not recognize a common law claim for wrongful constructive discharge in violation of public policy where the claim is predicated upon the employee's status rather than conduct. *List* holds that where the employee has an adequate statutory cause of action for wrongful discharge which is sufficient to protect his or her rights, that remedy is exclusive and no common law remedy is available under *Burk.*

In *List,* the plaintiffs, husband and wife, both worked for Anchor Paint and claimed they were constructively discharged because the employer made the work environment so intolerable that they had to quit. After twenty years of employment, Mr. List was demoted and given more difficult work with less authority, responsibility and pay. He terminated his employment and because he claimed the demotion was due to age discrim-

ination, he sought the services of an attorney in regard to his rights. When Anchor Paint learned that Mr. List had consulted an attorney, it allegedly made Mrs. List's work environment so unbearable that she also was forced to leave. Both former employees brought *Burk* claims asserting their discharges were in violation of the public policies set forth in the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626(b), and Oklahoma's Anti–Discrimination Act, 25 O.S.1981, § 1302.

In discussing the *Burk* tort, we noted that the action by the Lists was distinguishable from the action brought by the plaintiff in *Tate v. Browning–Ferris*, 833 P.2d 1218 (Okla.1992), where this Court recognized that a racially motivated discharge action under *Burk* was not preempted by Title VII or by Oklahoma's anti-discrimination statutes, 25 O.S.1981, §§ 1101, *et seq.*, because the remedies available to the plaintiff in *Tate* were significantly less comprehensive than those available to the Lists. For this same reason, we find that *Tate* does not apply here and that *List* controls the preemption concerns before us.

In support of our holding in *List* we pointed to a Maryland Court of Appeals case dealing with a sex discrimination discharge. *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989). We stated:

"[In *Makovi*, the court] declined to extend the reach of common law retaliatory discharge protection to a sex discrimination claim, because plaintiff had remedies under state and federal legislation. The Maryland court held that, in deciding whether a legislatively mandated public policy would support a common law retaliatory discharge claim, the court must look

at each case as it arises. In its analysis, the court must insure that it 'does not isolate the legislative remedy from the public policy goal, and does not consider the latter in a vacuum.' We approve this method of analysis and will use it here." *List*, 910 P.2d at 1014.

We further noted that many courts have refused to allow common law wrongful discharge actions where the discharge arises from the employee's status rather than the employee's acts.[2]

Finally, in *List*, we considered the teaching of Professor Larson where he criticized the use of discrimination statutes as the basis for a public policy exception. 1 L. Larson, *Unjust Dismissal* § 6.10[6][e] (1989). We agree with Professor Larson that basing public policy exceptions on discrimination laws could lead discharged employees to bring a *Burk* action and ignore altogether the statute (and its remedies) that the action is based upon. The court in *Makovi* summed up this misuse of the public policy exception tort claim when it held:

"In cases of discharge motivated by employment discrimination prohibited by Title VII and [Maryland's anti-discrimination statute] the statues create both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception. Thus, the generally accepted reason for recognizing the [public policy exception] tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legisla-

---

**2.** See *Burk*, 770 P.2d at 29, where we noted that an employee's termination may be actionable "where an employee is discharged for *refusing to act* in violation of an established and well-defined public policy or for *performing an act* consistent with a clear and compelling public policy." (Emphasis added). *See also Hinson v. Cameron*, 742 P.2d 549 (Okla.1987), where we enumerated several public policy grounds the violation of which was recognized as actionable by courts under the wrongful discharge rubric. These included claims grounded on termination for "(a) refusing to participate in an illegal activi-

ty; (b) performing an important public obligation; (c) exercising a legal right or interest; (d) exposing some wrongdoing by the employer; and (e) performing an act that public policy would encourage or, for refusing to do something that public policy would condemn, when the discharge is coupled with a showing of bad faith, malice or retaliation." 742 P.2d at 552–553 (Citations omitted). We mention these only to note that each one pertains to actions taken or refused to be taken by the employee. None relate to the employee's status—race, age, gender, etc.

ture in establishing the very policy relied upon." 561 A.2d at 190.

Indeed, this Court held likewise in *List* where we concluded by stating:

"Mr. List has adequate statutory remedies, and his claim is not based on retaliation for anything that he did. Instead, Mr. List's claim is based solely upon his status, his age. Because Mr. List's statutory remedies are adequate and his common law claim is based solely on his status, his statutory remedies are exclusive. Thus, he has no common law remedy for constructive discharge." 910 P.2d at 1015.

 We apply this reasoning to Marshall's claim for hostile work environment sexual harassment. Marshall's claim is based solely upon her status; it has nothing to do with her acts. Although Title VII did not provide adequate remedies at the time of *Tate*, it now allows for jury trial and for compensatory and punitive damages. *See* 42 U.S.C. § 1981a; *Beesley v. Hartford Fire Ins. Co.*, 723 F.Supp. 635, 652 (N.D.Ala.1989); *Johnson v. Indopco, Inc.*, 846 F.Supp. 670 (N.D.Ill.1994); *Mills v. Amoco Performance Products, Inc.*, 872 F.Supp. 975 (S.D.Ga. 1994). An employee who shows that he or she was constructively discharged due to a hostile work environment caused by sexual harassment has adequate remedies available under Title VII. In addition, Oklahoma's anti-discrimination statutes also provide adequate remedies.[3] We need not extend the narrow *Burk* exception to the terminable at-will rule to Marshall's claim. Marshall has adequate remedies for gender discrimination under statute. The trial court did not err in granting summary judgment to Dollar on

Marshall's claim for hostile work environment sexual harassment.[4]

### III

THE FACTS DO NOT SUPPORT A CLAIM AGAINST DOLLAR FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

 As for the claim for intentional infliction of emotional distress, Marshall presented no evidentiary materials in her response to summary judgment which even suggested that Dollar *intended* for Frazier to sexually harass her. Nor did Marshall show extreme or outrageous conduct by Dollar which "recklessly" caused severe emotional distress.[5] *Breeden v. League Serv. Corp.*, 575 P.2d 1374 (Okla.1978). Marshall does not have an action for intentional infliction of emotional distress against Dollar.

### CONCLUSION

Marshall has failed to show that any of her actions either based upon gender discrimination or intentional tort are proper against Dollar. Adequate statutory remedies are available to her to redress the discrimination she claims to have experienced. These statutory remedies, however, may not also be used by Marshall to assert a public policy has been violated thereby creating a tort claim based upon the holding of *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla.1989). In addition, Marshall has not produced evidentiary materials to support a claim for intentional infliction of emotional distress against her employer. There is no substantial controversy as to any material fact, and Dollar was enti-

---

**3.** One of the expressed purposes of Oklahoma's anti-discrimination statute was to implement the provisions of Title VII into the State of Oklahoma. *See* 25 O.S.1991, § 1101(a) and *Tate*, 833 P.2d at 1228. *List* teaches that we must therefore interpret Oklahoma's anti-discrimination statute together with Title VII in order to determine an employee's rights under state law.

**4.** Our holding answers the question we declined to answer in *Brown v. Ford*, 905 P.2d 223 (Okla. 1995), where we stated:

"As stated earlier in this opinion, we will not pause to consider today whether the *Burk* exception may generally be invoked to press a claim for wrongful discharge in culmination of work-

related (or on-the-job) sexual harassment by "hostile work environment" *against an employer who is subject to statutory anti-discrimination remedies.*" (Emphasis in original)

**5.** In defense of Marshall's claims, Dollar also asserted Marshall had committed acts when applying for the job and while working for Dollar for which Dollar would have terminated her if it had been aware of them at the time. Because we find Marshall asserted insufficient facts to support her claims, we need not discuss the "after-acquired evidence" rule as to wrongful termination actions.

tled to judgment as a matter of law on all claims. *Sellers v. Oklahoma Pub. Co.*, 687 P.2d 116 (Okla.1984). The trial court did not err in granting summary judgment to Dollar.

For the above and foregoing reasons, the opinion of the Court of Civil Appeals is VACATED and the judgment of the district court is AFFIRMED.

SUMMERS, V.C.J., and HODGES, LAVENDER, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

KAUGER, C.J., concurs in result.

OPALA, J., concurs in judgment.